Jerry GLIDEWELL, Deceased, by a substituted plaintiff, Deborah Ann Nabors, Personal Representative of the Estate of Jerry Glidewell, Plaintiff–Respondent,

v.

S.C. MANAGEMENT, INC., d/b/a Twin Rivers Regional Medical Center, Defendants–Appellants.

Jerry GLIDEWELL, Plaintiff–Respondent,

v.

S.C. MANAGEMENT, INC., d/b/a Twin Rivers Regional Medical Center, Defendant–Respondent,

v.

Dr. Gregory S. WILEY, Defendant–Appellant.

Nos. 20055, 20103.

Missouri Court of Appeals, Southern District, Division Two.

June 4, 1996.

*Parker v. State,* 836 S.W.2d 469 (Mo.App.E.D. 1992). The holdings for which we cite *Parker* remained intact on those occasions.

---

John L. Oliver, Jr., Oliver, Oliver & Waltz, Cape Girardeau, for defendant-appellant-respondent S.C. Management, Inc., d.b.a. Twin Rivers Regional Medical Center.

J. Michael Payne, Limbaugh, Russell, Payne & Howard, Cape Girardeau, for defendant-appellant Dr. Gregory S. Wiley.

Gary B. Brewer, Ward & Reeves, Caruthersville, for plaintiff-respondent.

SHRUM, Chief Judge.

(On December 13, 1995, this court issued an opinion affirming the judgments of the trial court. On February 20, 1996, by order of the Missouri Supreme Court this cause was transferred to that court. On May 28, 1996, the supreme court entered an order retransferring the cause to this court. The original opinion of this court, which follows, is now readopted and reissued.)

The multiple issues dealt with in this opinion stem from a claim for medical negligence asserted by Jerry Glidewell (Plaintiff) against S.C. Management, Inc., d/b/a Twin Rivers Regional Medical Center (Hospital) and Dr. Gregory Wiley (Physician).[1] Plaintiff's only claim against Hospital was that it was vicariously liable for Physician's negligence in failing to diagnose colorectal cancer in Plaintiff. Hospital filed a cross-claim for indemnity from Physician for any sums Plaintiff recovered against Hospital.

Before trial, Plaintiff settled with Physician, executing a release that reserved his claim against Hospital. Plaintiff then tried his claim against Hospital to a successful conclusion before a jury. Afterward, the trial court sustained Hospital's motion for summary judgment against Physician.

This consolidated appeal contains two cases. In No. 20055, Hospital appeals from the judgment adverse to it. Hospital raises ten points on appeal. Specifically, Hospital contends that Physician's release exonerated Hospital (Point I); the trial court erred in failing to instruct on apportionment of fault (Point II); Plaintiff's petition was not sufficient to state a claim for which relief could be granted (Point III); Plaintiff's agency pleading was insufficient (Point VI); the trial court erred in allowing certain argument and testimony (Point VII); Plaintiff's verdict directing instruction was erroneous (Point VIII); Plaintiff's closing argument as it addressed the issue of agency was prejudicial (Point IX); and Plaintiff's evidence of agency was insufficient (Point X). Finally, Hospital raises issues with respect to the admissibility of the opinions provided by Plaintiff's experts (Points IV and V). Finding no reversible error as averred, we affirm in No. 20055.

In No. 20103, Physician appeals from the judgment adverse to him on Hospital's cross-claim for indemnity. He raises two points. First, he contends that § 538.230 applies to this case, and thus Physician could settle with Plaintiff without being subjected to Hospital's claim for indemnity. Second, Physi-

---

1. Plaintiff died after trial. Deborah A. Nabors, personal representative of Plaintiff's estate, has been substituted as Respondent in No. 20055.

cian argues that the indemnity claim was not mature as the Hospital had not made payment to Plaintiff and therefore had not sustained an actual loss. We disagree on both points. We affirm in No. 20103.

## CASE NO. 20055—HOSPITAL'S APPEAL

Plaintiff first went to Physician in July of 1992 in connection with a seizure disorder. On April 5, 1993, Plaintiff saw Physician, this time complaining of rectal bleeding. During that visit, Physician did a digital rectal examination, but performed no other examinations. His diagnosis was that Plaintiff had hemorrhoids and anal fissures.

Throughout the litigation, Plaintiff's expert testimony focused on Physician's failure to perform a sigmoidoscope examination on April 5, 1993, concluding that such an examination would have detected the tumor in Plaintiff's colorectal region at that time.

Plaintiff saw Physician eleven times in the next seven months, with complaints of rectal bleeding, diarrhea, change in bowel habits, weight loss, and abdominal pain. Plaintiff went to the emergency room four times during this period, and was admitted to Hospital in October 1993. Physician never diagnosed colorectal cancer.

Plaintiff's colorectal cancer was ultimately diagnosed by another physician, and a colostomy was subsequently performed. Despite the procedure and follow-up treatment, the prognosis was that Plaintiff was terminally ill. He died shortly after trial.

In October 1994, Plaintiff settled his claim against Physician for the sum of $67,500 in exchange for a release which recited that Plaintiff could continue to pursue Hospital. Based on the settlement, the trial court dismissed Plaintiff's action against Physician on November 1, 1994.

As previously stated, Plaintiff was indeed successful at trial against Hospital, receiving a jury verdict of $313,000. The trial court entered a judgment for $245,500, which was the verdict balance after Hospital was credited with the $67,500 settlement paid by Physician. The appeal in No. 20055 followed.

Other facts are recited when relevant to our analysis of the various points.

*Did Plaintiff's Settlement With Physician Release Hospital?*

■ In its first point, Hospital contends that the trial court erred when it rejected Hospital's various requests that judgment be entered for it as a matter of law. Relying in large measure on *Max v. Spaeth*, 349 S.W.2d 1 (Mo.1961), and *Burnett v. Griffith*, 739 S.W.2d 712 (Mo.banc 1987), Hospital argues that when Plaintiff settled with Physician, that agreement operated to release Hospital because its liability was solely derivative. Hospital insists that language in *Max* that "[a] valid release of a servant from liability for tort operates to release the master" is good law and governs this case.

In response, Plaintiff argues that § 537.060 now controls and authorizes a claimant to settle with an agent for his tortious conduct without thereby releasing the master whose only liability is derivative.[2] As case authority for that proposition, Plaintiff cites *Aherron v. St. John's Mercy Medical Center*, 713 S.W.2d 498 (Mo.banc 1986), and *Manar v. Park Lane Medical Center*, 753 S.W.2d 310 (Mo.App.1988), the latter being a case said to be directly in point.

Hospital concedes that *Manar* is directly in point, yet insists that it was wrongly decided. The Western District in *Manar* held that the release of claims against five medical practitioners did not operate to release the plaintiff's derivative claims against a hospital.

In urging that *Manar* should be disregarded, Hospital points out—correctly so—that the decision "turns entirely on the assumption that '[§ 537.060] serves to preserve

---

**2.** Additionally, Plaintiff points to § 538.230 as supporting his position that Hospital's contentions in Point I lack merit. We disagree. As we explain in our discussion of Point II of No. 20055 and Point I of No. 20103, § 538.230 is inapposite in this case because Hospital's liability was solely derivative.

claims in cases of vicarious liability against tortfeasors not included in the partial release.'" Hospital insists that this reasoning is illogical and should not be followed by this court. This ignores the fact that the *Manar* court obviously believed its decision was mandated by *Aherron*, 713 S.W.2d 498. If *Manar* correctly read and applied *Aherron*, then we too are bound by *Aherron*.

*Manar's* analysis of *Aherron* proceeded thusly:

"Although the present case is the counterface of *Aherron* ..., the [*Aherron*] decision is of critical and controlling significance because of the basis employed in the decision. *Aherron* expressly disclaims any need to determine whether, under Missouri law, a release of the master also acts as a release of the servant. Instead, the *Aherron* decision is based entirely on the effect of § 537.060, RSMo 1986, which, it is held, operates to preclude the unintended release of persons liable in tort. In the language of *Aherron*, 'An employee and a vicariously liable employer are "persons liable in tort for the same injury or wrongful death," and therefore subject to the statutory provisions controlling partial settlement and release.' *Aherron*, 713 S.W.2d at 501.

"In either situation, the partial release of the employer or the partial release of the employee, the basis for decision in *Aherron* holds that the statute serves to preserve claims in cases of vicarious liability against tort-feasors not included in the partial release." (Emphasis ours.)

*Manar*, 753 S.W.2d at 313. In our view, the Western District correctly read *Aherron* as compelling the decision it made in *Manar*.

We make these additional observations about *Aherron's* controlling effect on this case. As the *Aherron* court noted, the second and third sentences of § 537.060 [3] are "substantially the same as § 4 of the Uniform Contribution Among Tortfeasors Act (1955 Revision), 12 U.L.A. 57 (1975) (hereafter UCATA)." 713 S.W.2d at 501. Many courts have struggled with the issue of whether UCATA § 4 abrogates the common law principles that "release of a servant from liability for tort operates to release the master ... [and] likewise release of the master releases the servant...." *See Max*, 349 S.W.2d at 3 (mentioning such common law principles). Several of these courts have concluded that the 1955 version of UCATA § 4 applies to vicarious liability, all of them holding that § 4 expressly applies to all "persons liable in tort." *See Saranillio v. Silva*, 78 Hawai'i 1, 889 P.2d 685, 693–96 (1995) (discussing cases under both versions of UCATA).

Although Hospital repeatedly insists that a master is not a joint tortfeasor (actually, § 537.060 does not contain the word "joint"), its exhortations to not follow *Manar* ignore the fact that the supreme court has already decided this integral question. Our supreme court specifically held in *Aherron* that "a vicariously liable employer as well as its employee *are tortfeasors*" within the meaning of § 537.060. 713 S.W.2d at 501 (emphasis ours). Moreover, they are also "'persons liable in tort for the same injury or wrongful death,' and therefore subject to the statutory provisions controlling partial settlement and release." *Id.* As we interpret *Aherron*, our supreme court has sided with those courts that have concluded that the 1955 version of UCATA § 4 applies to vicarious liability and

3. Sentences two through four of § 537.060 read:

"[Sentence two:] When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall not discharge any of the other tort-feasors for the damages unless the terms of the agreement so provide; however such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichev-

er is greater. [Sentence three:] The agreement shall discharge the tort-feasor to whom it is given from all liability for contribution or noncontractual indemnity to any other tort-feasor. [Sentence four:] The term "**noncontractual indemnity**" as used in this section refers to indemnity between joint tort-feasors culpably negligent, having no legal relationship to each other and does not include indemnity which comes about by reason of contract, or by reason of vicarious liability." (Emphasis in original.)

has done so in broad language that abrogates the common law rules mentioned in *Max.*

Finally, we address Hospital's additional argument in Point I that *Manar* ignores Article V, Section 2 of the Constitution by disregarding *McGinnis v. Chicago, R.I. & P. Railway Company*, 200 Mo. 347, 98 S.W. 590 (1906), and also *Burnett*, 739 S.W.2d 712 (reaffirming the continued viability of the McGinnis Doctrine). The so-called McGinnis Doctrine is found in this language:

"We are firmly of the opinion that in cases where the right to recover is dependent solely upon the doctrine of respondeat superior, and there is a finding that the servant through whose negligence the master is attempted to be held liable, has not been negligent, as was true in the case in hand, there should be no judgment against the master."

*McGinnis*, 98 S.W. at 594.

*McGinnis* and its progeny, including *Burnett*, have applied the *McGinnis* rule of exoneration of vicariously liable masters only in those cases where a servant was adjudged not liable by a fact-finder. In contrast, *Aherron* says the pertinent rule in Missouri in *release cases* involving vicarious liability is provided by § 537.060. 713 S.W.2d at 501. The *Aherron* court was not faced with a *McGinnis*-like fact situation; consequently, *Burnett* and *Aherron* do not conflict.

We conclude that *Aherron* is controlling in this case and that *Manar* was correct in following *Aherron*. We deny Point I.

*Was Hospital Entitled To An Apportionment of Fault Instruction?*

In its second point, Hospital contends that § 538.230 entitled it to an apportionment of fault and that the trial court erred in refus-

ing to give the jury the instruction tendered by Hospital on this subject.[4] Hospital further claims that had the apportionment instruction been given, the jury could only have apportioned fault at 100 percent to Physician, thus entitling Hospital to a judgment as a matter of law. This is said to follow due to Plaintiff's evidence which showed that only Physician was primarily liable for Plaintiff's injuries, and Hospital's liability, if any, was only derivative.

■ Contrary to Hospital's contentions, when a claim is based upon vicarious liability, there is no basis for apportionment of fault between the principal and agent. *American National Bank and Trust Company v. Columbus–Cuneo–Cabrini Medical Center*, 154 Ill.2d 347, 181 Ill.Dec. 917, 921, 609 N.E.2d 285, 289 (1992). The very nature of vicarious liability leads to that conclusion: "[u]nder the doctrine of respondeat superior, a master is liable for the negligent acts of his servant, despite the absence of any direct negligence on the master's part, provided the servant's acts are within the scope of his duties to the master." *Helm v. Wismar*, 820 S.W.2d 495, 497[5] (Mo.banc 1991). In such cases, the liability of the master is fixed by the amount of liability of the servant. *McHaffie v. Bunch*, 891 S.W.2d 822, 826 (Mo.banc 1995).

Treatise writers explain why apportionment is ill-suited for cases where a party's liability for negligence is solely derivative thusly:

"The liability of a master for the acts of a servant ... within the scope of the employment ... stands upon grounds that do not support apportionment. Under the doctrine of respondeat superior, the master becomes responsible for the same act for which the servant is liable, and for the same consequences. Ordinarily there is a

---

4. Section 538.230.1 reads:

"1. In any action against a health care provider for damages for personal injury or death on account of the rendering of or failure to render health care services *where fault is apportioned* among the parties and persons released pursuant to subsection 3 of this section, the court, unless otherwise agreed by all the parties, shall *instruct*

*the jury to apportion fault* among such persons and parties, or the court, if there is no jury, shall make findings, indicating the percentage of total fault of all the parties to each claim that is allocated to each party and person who has been released from liability under subsection 3 of this section." (Emphasis ours.)

sound basis for indemnity, but not for any apportionment of damages between the two."

W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 52 at 346 (5th ed. 1984). *See also American National,* 181 Ill. Dec. at 921, 609 N.E.2d at 289; *Mas v. Two Bridges Associates,* 75 N.Y.2d 680, 555 N.Y.S.2d 669, 674, 554 N.E.2d 1257, 1262 (1990).

By its plain language, § 538.230 applies only in those cases *"where fault is apportioned."* As Hospital's liability was solely derivative, § 538.230 is inapposite in this case. We conclude that there is only a basis for indemnity here, not for apportionment of fault. The trial court did not err in refusing to instruct the jury on apportionment of fault. We deny Point II.

*Sufficiency of Pleading*

In its third point, Hospital contends that the trial court erred in denying its motions to dismiss Plaintiff's petitions (original and amended) because Plaintiff's petitions failed to allege facts sufficient to state a claim for relief on a "lost chance of survival" theory in that Plaintiff was alive, hence "no loss had yet occurred." Continuing, Hospital argues that when Plaintiff abandoned his "lost chance" theory, no alternative pleading existed to support any cause of action.

We need not address the question of whether death of the claimant is an element of the recently recognized "lost chance of survival" cause of action. *See Wollen v. De-Paul Health Center,* 828 S.W.2d 681 (Mo. banc 1992). This is so because Plaintiff did abandon "lost chance of survival" as a theory of recovery during the pre-trial conference. The trial then proceeded to conclusion without Hospital challenging Plaintiff's amended petition as insufficient to state a cause of action on a theory other than "lost chance."

Nevertheless, we address Hospital's challenge to the sufficiency of Plaintiff's petition because the defense of failure to state a claim upon which relief can be granted is never waived. *Murray v. Ray,* 862 S.W.2d 931,

933[2] (Mo.App.1993); Rule 55.27(g)(2). Upon review, we conclude that Plaintiff's petition pleads sufficient facts to support a failure-to-diagnose cause of action.

*Wollen* tells us that the element of causation splits failure-to-diagnose cases into three types, "two of which involve 'reasonable medical certainty,' and a third that does not." 828 S.W.2d at 682. The first of these, which does involve reasonable medical certainty, is labelled "but for" causation, where:

"[T]he patient has a disease for which, at the stage the patient seeks diagnosis, there is a cure that works in the overwhelming majority of cases. Death from this type of disease caught at this stage is rare unless either the patient or the doctor is negligent at some stage of the treatment process."

*Id.* While the second type is not relevant here, the third type is the "lost chance of survival" failure-to-diagnose case, described again by our supreme court:

"Doctors have a treatment that works in a large number of cases and fails in a large number of cases. Because there is a real chance that the patient will survive and a real chance that the patient will die from the disease—even if it is diagnosed—it is impossible to state with 'reasonable medical certainty' the effect of the failure to diagnose on a specific patient, other than the fact that the failure to diagnose eliminated whatever chance the patient would have had."

*Id.*

■ Although Plaintiff abandoned this "lost chance of survival" theory of recovery, his pleadings are still sufficient to make out the first type of failure-to-diagnose case, the "but for" variety. In his amended petition, Plaintiff alleged that:

"5. [Physician] was negligent in the following respects:

(a) in failing to diagnose Plaintiff's rectal cancer;

(b) in failing to conduct a proper and thorough rectal exam which, if had been

conducted, would have detected the presence of the rectal cancer;

. . . .

"6. ... Had [Physician] properly diagnosed Plaintiff's rectal cancer, Plaintiff had a great chance of surgical cure and survival. Plaintiff now has cancer that is inoperable and incurable. Plaintiff now has a shortened life span, is unable to pursue his usual forms of recreation and enjoyment of life, has suffered and will continue to suffer great physical pain, mental anguish, and physical impairment, and has incurred and is reasonably certain to incur in the future substantial expenses for medical treatment."

■ In considering the sufficiency of pleadings on a motion to dismiss, we are compelled to "give the averments a liberal construction and accord the petition those reasonable inferences fairly deductible from the facts stated." *Scheibel v. Hillis*, 531 S.W.2d 285, 289[11] (Mo.banc 1976). In particular, since we are considering the sufficiency of the pleadings after verdict and judgment, "we must indulge every reasonable intendment in favor of the petition." *Stephens v. Kansas City Gas Co.*, 354 Mo. 835, 191 S.W.2d 601, 603[2] (1946).

■ Plaintiff's petition easily brings his claim into the realm of the three types of failure-to-diagnose cases, specifically couching Physician's negligence in terms of his failure to diagnose Plaintiff's cancer. Furthermore, given the liberal construction we must afford it, it pleads sufficient facts amounting to "but for" failure-to-diagnose in that it alleges that but for Physician's failure to timely diagnose the cancer, Plaintiff had a "great chance of surgical cure" without physical or mental impairment and without loss of quality of life. In the "but for" failure-to-diagnose cause of action, a plaintiff must plead "a reasonable medical or scientific certainty that defendant's negligence caused the harm." *Wollen*, 828 S.W.2d at 682. We hold that Plaintiff has pled sufficient facts to support the "but for" failure-to-diagnose cause of action. We deny Point III.

### Expert Witness Testimony on Ultimate Issue

In its fourth point, Hospital contends that the trial court erred when it allowed Plaintiff to elicit an opinion from one of his two experts, Dr. Howard Ozer, as to whether Physician was negligent. Hospital asserts that "such evidence is not the proper subject matter of expert testimony, constituted evidence of a legal conclusion, and invaded the province of the jury."

The testimony which prompts Hospital's allegation of error was presented as follows:

"Q. [By Plaintiff's Counsel:] Dr. Ozer, I'd like you now to assume that a doctor failed to do or order a sigmoidoscope examination on a 45–year–old male patient with complaints of bleeding from the rectum.

Now, do you have an opinion to a reasonable degree of medical certainty, whether such failure would be medical negligence? *And by negligence, I mean the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by those physicians practicing internal medicine?*

A. I do.

Q. And what is that opinion, sir?

. . . .

A. It would be medical negligence." (Emphasis ours.)

In arguing that the above questions were improper and that Dr. Ozer's answers were inadmissible, Hospital asserts, without citation to authority, that "[t]he *concept of 'negligence'* is ... the ultimate question of law." By using that as its premise and relying on the long-standing principle that "an expert's opinion 'cannot be received if it amounts to a conclusion of law[,]' " *Young v. Wheelock*, 333 Mo. 992, 64 S.W.2d 950, 957[25] (1933) (quoting *Fields v. Luck*, 44 S.W.2d 18, 21 (Mo. 1931)), Hospital arrives at its position that the trial court committed reversible error in allowing this testimony.

■ We agree that defining the *"concept of negligence"* is, indeed, a question of law.

However, negligence in a specific case is an ultimate issue of fact and not a conclusion. *Maybach v. Falstaff Brewing Corporation,* 359 Mo. 446, 222 S.W.2d 87, 92 (1949); *Coleman v. City of Kansas City, Missouri,* 859 S.W.2d 141, 147 (Mo.App.1993).

Under the liberalized rule governing the admission of expert testimony, § 490.065, the testimony of an expert witness "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." § 490.065.2. In *Lee v. Hartwig,* 848 S.W.2d 496 (Mo.App.1992), the Western District analyzed the statute thusly:

"This statute [§ 490.065.2] clearly allows an expert to testify as to his opinion concerning an ultimate issue, *such as whether a party was negligent.* The term 'negligence' should be defined in the questioning so that it can be ascertained whether [or not] the standard for determining 'negligence' which is used by the expert is the same standard to be applied by the jury under the instructions of the court. *When the legal term 'negligence' is defined in accordance with the applicable jury instruction, the legal issue of negligence becomes an ultimate fact issue for the trier of fact . . . .* Under § 490.065, testimony on ultimate fact issues is admissible for the guidance of the jury in their fact finding mission."

*Id.* at 498[2] (emphasis ours).

■ We believe the *Lee* analysis of § 490.065 is sound and should be applied in this case. Here, Plaintiff's counsel did supply the correct definition of medical "negligence" ·in the immediate context of the question, thus enabling the jury to know what Dr. Ozer meant by the word "negligence." It was not an abuse of discretion for the trial court to overrule the objection in view of the definition of negligence supplied with the question. *See Lee,* 848 S.W.2d at 498–99.

In reaching this conclusion, we do not ignore *Stucker v. Chitwood,* 841 S.W.2d 816 (Mo.App.1992), cited by Hospital as its principal authority on this point. However,

*Stucker* does not control here because of factual dissimilarities. After noting that "[t]he essential test of admissibility of expert opinion evidence is whether it will be helpful to the jury[,]" this court held in *Stucker* that a highway patrolman's opinion was not admissible under § 490.065 because "[i]n this era of widespread highway travel . . . a jury, usually composed of adult drivers for the most part, is capable of reaching its own conclusions with regard to fault and degree of fault in a case of this type." *Id.* at 819–20[3]. That is not this case.

Missouri courts have long recognized that in the great majority of medical malpractice cases, proof of what is the requisite standard of medical care must be established by the testimony of a medical expert. *E.g. Hart v. Steele,* 416 S.W.2d 927, 931[8] (Mo.1967); *Cline v. William H. Friedman & Associates,* 882 S.W.2d 754, 758 (Mo.App.1994). This is true because ordinary laypersons are not equipped by common experience and knowledge to judge the skill and competence of the practice at issue and determine whether it squares with the acceptable standards of such professional practice. *Yoos v. Jewish Hospital of St. Louis,* 645 S.W.2d 177, 183 (Mo.App.1982). *See also Hart,* 416 S.W.2d at 932[9]. Thus, *Stucker* does not aid Hospital. We deny Point IV.

*Were Expert Opinions Based on Minimally Reliable Facts?*

In Point V, Hospital first contends that Plaintiff's medical records did not provide "minimally reliable facts" which could be used by Plaintiff's two expert witnesses (Howard Ozer, M.D., and C.P. McGinty, M.D.) as a foundation for their opinions, and consequently, the trial court erred in admitting their testimony over objection.

■ As we understand it, Hospital's position is that the presence of statements of opinion in Plaintiff's medical records rendered such records unusable as a foundation for expert testimony regardless of the quantity and quality of non-opinion facts in such records and despite the fact that the records were in evidence. Hospital cites no in-point

authority to support its broad proposition and our independent research reveals none.[5]

Section 490.065, RSMo 1994, liberalized the rules governing the admissibility of expert opinions.[6] However, even prior to its enactment, Missouri courts had determined that "[a]n expert witness may base an opinion 'upon matters within his personal knowledge or observation, *upon competent evidence in the case* or upon both.'" *Division of Family Services v. Guffey*, 795 S.W.2d 546, 551[6] (Mo.App.1991) (quoting *Wiley v. Pittsburg & Midway Coal Mining Company*, 729 S.W.2d 228, 232[2] (Mo.App.1987). "Hospital records which have been admitted into evidence may properly be considered by an expert witness as a basis for opinion testimony." *Id.* at 551[7] (citing *Harris v. Goggins*, 374 S.W.2d 6, 15[12] (Mo. banc 1963)).

Here, the medical records which the two experts relied on were admissible under § 490.680, RSMo 1994, and were, in fact, admitted into evidence. *See Baugh v. Life & Casualty Insurance Company of Tennessee*, 307 S.W.2d 660, 665[4] (Mo.1957) (hospital records); *Miller v. Engle*, 724 S.W.2d 637, 640[3] (Mo.App.1986) (medical records). The mere fact that the records contained statements of expert medical opinion would not have given Hospital a basis for seeking their exclusion. *See Miller*, 724 S.W.2d at 640[3].[7] By analogy, the presence of expert medical opinions in Plaintiff's records does not render them unusable as a foundation for expert testimony. Neither does it compel the conclusion that the opinions of Ozer and McGinty were based wholly upon the opinions of others. Although Hospital complains about a defect in one of the hypothetical questions, under the 1989 law pertaining to expert witness testimony, any such defect should be left to the cross-examiner to expose. A thorough review of the medical records in question convinces us that they provided a sufficient foundation—without considering any opinions therein—for Plaintiff's experts to base their opinions on.

The liberalized rule stated in § 490.065.3 certainly does not lead to a different result. While FED.R.EVID. 703 explicitly obviates the requirement that the facts or data must be in evidence, it is otherwise substantively identical to § 490.065.3. Accordingly, the advisory committee notes on what facts or data are reasonably reliable remain very instructive:

"The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. In this respect the rule is designed to broaden the basis for expert opinions beyond that current in

---

5. We do not ignore several cases cited by Hospital but find them so factually distinguishable that they provide no support for Hospital's argument. The first case, *Holmes v. Gamewell*, 712 S.W.2d 34 (Mo.App.1986), is inapposite since the plaintiff was attempting to introduce medical records as a substitute for expert testimony. The question of whether the records provided a sufficient basis for expert testimony was not present. The next case, *White v. American Republic Insurance Company*, 799 S.W.2d 183 (Mo.App.1990), is distinguishable since it concerned the attempted use of medical records not in evidence to provide the basis for an expert opinion. Here, the medical records were in evidence. Finally, Hospital cites *Wagner v. Pichler*, 879 S.W.2d 789 (Mo.App. 1994), as being directly in point. It is not, since it too concerned the exclusion of an expert opinion based on a fact not in evidence.

6. In pertinent part, § 490.065 provides:
"3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.
"4. If a reasonable foundation is laid, an expert may testify in terms of opinion or inference and give the reasons therefor without the use of hypothetical questions, unless the court believes the use of a hypothetical question will make the expert's opinion more understandable or of greater assistance to the jury due to the particular facts of the case."

7. Hospital cites *Edgell v. Leighty*, 825 S.W.2d 325, 328 (Mo.App.1992), for the proposition that an expert cannot give an opinion based on hearsay. However, as the *Miller* court points out, medical records are not inadmissible hearsay, since a hearsay exception is granted by qualifying the document as a business record. *Miller*, 724 S.W.2d at 640[3].

many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes."

FED.R.EVID. 703 advisory committee's note. *See also Stallings v. Washington University,* 794 S.W.2d 264, 271 (Mo.App.1990) (citing and discussing this note).

■ Medical records are the quintessential example of the type of facts or data reasonably relied upon by experts in the field of medicine. Here, both Drs. Ozer and McGinty testified that the medical records reviewed by them were of the type normally and reasonably relied upon by them and others in their profession for diagnosing, treating, and evaluating the prognosis of cancer patients. Hospital offered no evidence to the contrary. Although a trial court has the "independent responsibility ... to decide if the foundational facts meet the minimum standards of reliability as a condition of the admissibility of the opinion," it is also true that "[a] trial judge is expected to defer to the expert's assessment of what data is reasonably reliable." *Wulfing v. Kansas City Southern Industries,* 842 S.W.2d 133, 152 (Mo.App.1992). It is only in those cases "[w]here the source upon which the expert relies for opinion is so slight as to be fundamentally unsupported, [that] the jury may not receive the opinion." *Id.* at 152[20].

Here, the various opinions of Drs. Ozer and McGinty were supported by medical records in evidence which amounted to a de-

tailed medical history of Plaintiff. We do not find those records to be so slight as to be fundamentally unsupported. Moreover, as the records were in evidence, they were available for the jury as evidence in their own right. Dr. Ozer's and Dr. McGinty's unchallenged validation of Plaintiff's medical records as being the type reasonably relied upon by experts in the field merited the trial court's deference. We do not find that the source of the experts' opinions, the medical records, was so factually deficient that the trial court should have determined that they did not meet minimum standards of reliability. We deny Point V.

*Ruling on Motions For More Definite Statement and To Strike*

In its sixth point relied on, Hospital charges that the trial court erred by overruling Hospital's pretrial motions to make more definite and certain or strike designated parts of Plaintiff's pleadings. In the "Point Relied On," Hospital directs us to several paragraphs in Plaintiff's pleadings which it claims were "without factual specificity as required by Rule 55.05." However, with a single exception mentioned below, the matters referenced in Point VI are not developed in the argument part of Hospital's brief, hence they are deemed abandoned and preserve nothing for appellate review. *Saunders–Thalden v. Thomas Berkeley,* 825 S.W.2d 385, 387[1] (Mo.App.1992).

In the argument part of its brief, Hospital does carry forward its argument that Plaintiff's attempt to plead an agent/principal, master/servant or employer/employee relationship was "fatally defective." The challenged paragraph read: "[A]t all times herein mentioned [Physician] was the agent, servant and employee of [Defendant] in the scope and course of [Defendant's] employment." Hospital asserts that the allegation was nothing more than a conclusion and did not meet the "fact pleading" requirement of Rule 55.05. Continuing, Hospital claims it was prejudiced when the trial court refused its motions because "Plaintiff's conclusionary petition set the stage for improper opening statement, the admission of irrelevant evi-

dence, erroneous jury instruction, and improper closing argument." In a similar vein, Hospital argues that "[t]he prejudice to [Hospital] was compounded by the Court's failure to require [Plaintiff] to make the [agency allegation] with respect to time more specific."

■ Rule 55.27(d) provides that a party may move for a more definite statement of any matter contained in a pleading which is not averred with sufficient particularity to enable the party to prepare a responsive pleading. A party who files a motion to make more definite and certain, in effect, concedes that the petition states a cause of action, but challenges, as an injustice to the defendant, the stating of the claim in the manner pleaded. *Kornberg v. Getz Exterminators, Inc.*, 341 S.W.2d 819, 820[1] (Mo. 1961). A trial court's ruling of such motion will not be disturbed provided that sound legal discretion was exercised. *Id.* at 821.

■ Here, the record before the trial court included Hospital's "Cross–Claim for Indemnity" filed against Physician and also Physician's answer to that cross-claim. In those pleadings, Hospital alleged and Physician admitted "[t]hat at all times relevant hereto, [Physician] was employed by [Hospital]." Under the circumstances, the trial court could reasonably have concluded that the facts surrounding Hospital's employment of Physician, and especially the time span of his employment, terms and conditions of his employment, and the Hospital's right of control of Physician, were peculiarly within the knowledge of Hospital, and were matters of which Plaintiff could not reasonably be expected to know precisely. *See Kornberg*, 341 S.W.2d at 822. We are not persuaded that

the trial court's refusal to sustain Hospital's motion for more definite statement worked an injustice on Hospital or left it so unapprised of Plaintiff's claims that it could not prepare a responsive pleading. We reject Hospital's arguments to the contrary.[8]

Hospital devotes one sentence of argument to its claim that the trial court erred when it refused to sustain Plaintiff's motion to strike. It reads: "Rule 55.27(e) permits the Court to strike from the pleadings conclusions." That argument, made without citation to authority, is frivolous. According to Rule 55.27(e), a motion to strike is appropriate to remedy "redundant, immaterial, impertinent, or scandalous matter" in a pleading, and no claim is made that Plaintiff's pleading contains any such matter. We deny Point VI.

*Unpreserved Point*

■ In Point VII, Hospital challenges several actions of the trial court, all of which involve its allowing certain argument and testimony. Point VII fails to comply with Rule 84.04(d).[9] A point relied upon has three components: (1) a concise statement of the challenged action or ruling of the trial court, (2) the rule of law which the trial court should have applied, and (3) the evidentiary basis upon which the asserted rule is said to be applicable. *Thummel v. King*, 570 S.W.2d 679, 684–86 (Mo. banc 1978). The second of these components is completely absent from Hospital's Point VII. Since Point VII alleges errors without stating why they are errors—in violation of Rule 84.04(d)—it preserves nothing for review. *See Hoffman v. Koehler*, 757 S.W.2d 289, 292[3] (Mo.App. 1988).

■ Nonetheless, we have turned to the argument portion of the brief in an attempt

---

8. We have not ignored *Downey v. Mitchell*, 835 S.W.2d 554 (Mo.App.1992), relied on by Hospital. There, the Eastern District found that the trial court did not abuse its discretion in refusing plaintiff's request to file a third amended petition. As part of its analysis, the *Downey* court observed that the plaintiff had never previously alleged agency and in her proposed third amended petition, did "not allege any facts tending to support the legal conclusion of an agency relationship between the doctor and the hospital." *Id.* at 556. Abuse of trial court discretion in

ruling on a motion for a more definite statement was not in issue in *Downey*, thus is not controlling in this appeal.

9. Rule 84.04(d) requires that "[t]he points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous...."

to discern any plain error. Rule 84.13(c); *Hoffman*, at 292[4]. However, with certain exceptions that do not aid in our review of this point, Hospital has failed to provide us with specific page references to the legal file or the transcript.[10] This violates Rule 84.04(h). "It is not our duty or responsibility to spend judicial time searching through legal files, transcripts or argument in an attempt to interpret the thrust of a party's contentions...." *McMullin v. Borgers*, 806 S.W.2d 724, 730 (Mo.App.1991). Point VII was unpreserved and we decline to give it plain error review for the reason stated.

*Alleged Instruction Error–Plain Error Review*

In Point VIII, Hospital fires a volley of charges at Instruction No. 6, Plaintiff's verdict directing instruction, which was based on MAI 21.01,[11] MAI 11.06, and MAI 13.06, as modified by MAI 18.01.[12]

■ Initially, we note that Hospital has violated Rule 84.04(e), which provides that if a point relied on "relates to the giving ... of an instruction such instruction shall be set forth in full in the argument portion of the brief." Nowhere in its brief does Hospital set forth the instruction it complains of in

Point VIII. "Rule 84.04 is to be strictly enforced." *McMullin*, 806 S.W.2d at 727[2]. Failure to place the instructions in the argument portion of the brief results in a failure to preserve the point on appeal. *Id.* at 727–28. In such a situation, Missouri courts have reviewed the point for plain error pursuant to Rule 84.13(c). *See State ex rel. Missouri Highway and Transportation Commission v. Thomas*, 772 S.W.2d 404 (Mo.App.1989) (instructions only in legal file).

■ Here, because the challenged instruction was included in the legal file, we gratuitously review the point for plain error. In making a plain error review under Rule 84.13(c), we have wide discretion, but to give Hospital relief on the ground of non-preserved error, the error must be "[p]lain error affecting substantial rights" resulting in "manifest injustice or miscarriage of justice." *Mosher v. Levering Investments, Inc.*, 806 S.W.2d 675, 677 (Mo. banc 1991).

Hospital begins its argument by stating that the instruction is not supported by the evidence since no evidence of agency existed. Since Hospital refers us to Point X of its brief for argument supporting this contention, we defer our discussion thereof until *"Sufficiency of Evidence on Agency Issue," infra.*

> First, [Physician] was an agent of [Hospital] and was providing medical care and treatment to the plaintiff in the scope and course of his agency for [Hospital], and
>
> . . . .
>
> The term 'negligent' or 'negligence' as used in this instruction means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of [Physician's] profession.
>
> Acts were within the 'scope and course of agency' as that phrase is used in this instruction if:
>
> 1. they were performed by [Physician] to serve the interests of [Hospital] according to an express or implied agreement with [Hospital], and
> 2. [Hospital] either controlled or had the right to control the physical conduct of [Physician]."

**10.** Hospital's sole page citation to the transcript in its initial brief refers us to Plaintiff's closing argument. Hospital's claim of reversible error due to closing argument is not part of the seventh point relied on. That contention is argued in Point IX, and we deal with it there.

Plaintiff calls attention to the lack of citations to the transcript in Hospital's brief, yet Hospital does next to nothing in its reply brief to remedy the deficiency. Albeit that Hospital finally sprinkles its argument with numerous transcript page references, all except one are to the pre-trial proceedings or the instruction conference. Hospital does reference one objection it made during testimony, but we deem this insufficient to provide us with a basis to review the four broad categories of testimony and evidence it refers to in its point relied on and initial brief.

**11.** All references to MAI are to 1991 (4th ed.).

**12.** We reproduce the pertinent part of the verdict director, Instruction No. 6:

"Your verdict must be for the plaintiff if you believe:

Hospital next claims that the wrong definition of agency was used in Plaintiff's verdict director, i.e., MAI 13.05 should have been used instead of MAI 13.06. The fallacy of this contention is exposed upon an examination of the "Notes on Use" which accompany these two instructions. The "Notes on Use (1990 Revision)" for MAI 13.05 advise that: "This definition may be used where the master-servant relationship is admitted but the master alleges that the servant was not on the master's business. See MAI 13.06 in case master-servant relationship is disputed." Conversely, the "Notes on Use (1990 Revision)" for MAI 13.06 instruct: "See MAI 13.04 and MAI 13.05 where there is no dispute as to the master-servant relationship." Hospital clearly was disputing the existence of a master-servant relationship (*see, e.g.,* discussion of Hospital's Point X, *infra* ), and the "Notes on Use" indicate that the trial court correctly submitted MAI 13.06 to the jury rather than MAI 13.05.

■ Hospital then takes issue with the fact that Plaintiff's verdict director deviated from MAI 18.01, a required modification for a verdict director where agency is in issue. MAI 18.01 [1991 Revision] instructs:

"Where defendant master or principal is being sued and he has denied agency of the alleged servant or agent, paragraph First in the verdict directing instruction shall be in the following form:

"First, the driver Jones [was an employee of Ajax and] was operating the (defendant's) motor vehicle within the scope and course of his [employment by] [agency for] (defendant's name) [at the time of the collision]."

This example demonstrates how to submit the issue of agency to the jury. Plaintiff's verdict director selected the bracketed phrase "agency for" but also substituted a word in the first bracketed phrase, changing it from "was an *employee* of ..." to "was an *agent* of...." As the MAI "Committee Comment (1991 Revision)," titled "How To Use This Book," warns:

"You may have the ability to improve an instruction in MAI but you do not have the authority to do it. Do not do it. The use of a provided MAI is mandatory. If you think the change of a word or phrase will make it a better instruction, do not do it. You are falling into error if you do.

"A modification which is necessary to make a provided MAI fit the facts of your case, however, is not only permissible but is required."

*Id.* at XXXV.

We need not decide whether the substitution constituted permissible or impermissible modification, since we do not find that the error resulted in "manifest injustice" or a "miscarriage of justice." *See* Rule 84.13(c). We are cognizant of the principle that the prejudicial effect of an erroneous instruction can be determined by looking to the argument. *Fowler v. Park Corporation,* 673 S.W.2d 749, 756[13] (Mo. banc 1984) (citing *Welch v. Hyatt,* 578 S.W.2d 905 (Mo. banc 1979)). Here, Hospital's closing argument equated the concepts of agency and employment: "I told you that the Judge was gonna tell you that the first question you'd have to answer is was [Physician] employed by [Hospital]. They used the word agent. Same two words, no different. So, is he their agent? Was he employed?" These statements removed any potential confusion amongst the jury over whether the term "agent" meant something different from the term "employee," which should have been used. Accordingly, submitting the verdict director in this form did not result in a miscarriage of justice.

■ Hospital's final attack on the propriety of Plaintiff's verdict director concerns the omission of the optional bracketed phrase from MAI 18.01, "[at the time of the ...]." The "Notes on Use" accompanying MAI 18.01 instruct that this bracketed term is to be added at the end of Paragraph First (see opinion footnote 12) if time is in issue. Hospital asserts that the question of whether Physician was the agent of Defendant *at the time* he failed to order the sigmoidoscope examination was a controverted fact in the case. From that premise, it argues that the

instruction was misleading and gave the jury a roving commission since it did not require the jury to find that each of the events occurred simultaneously, i.e., failure to order the sigmoidoscope examination, Physician's employment by Defendant, and that Physician was acting within the scope and course of his employment.

We shall assume, *arguendo,* that Hospital is correct in asserting that Instruction No. 6 should have contained the time element. However, in the total context of this case, we are not persuaded that a manifest injustice resulted from submission of Instruction No. 6 to the jury without the time element. The instruction, when viewed with all the other facts, did not cause confusion to the jury or mislead it. The issues before the jury were clear and simple—whether on *April 5, 1993,* Physician was negligent in not ordering a sigmoidoscope examination of Plaintiff's rectum and whether on that date Physician was an agent of Defendant acting within the course and scope of his agency. All the evidence and argument bearing on when and whether Physician was negligent was confined to that date. Counsel for both parties recognized April 5, 1993, as the date at issue in their closing arguments. On this record, no reasonable juror could have returned a verdict for Plaintiff without concluding that April 5, 1993, was the date of Physician's alleged negligence *and* that on that date he was the agent of Defendant acting within the course and scope of his authority.

In the total context of this case, we find no "[p]lain error affecting substantial rights" resulting in "manifest injustice or miscarriage of justice" from the submission of Instruction No. 6 to the jury. We deny Point VIII.

*Closing Argument Issues*

In its ninth .point, Hospital complains of improper closing argument from Plaintiff's counsel, arguments which Hospital contends were outside of any issue in the case but instead constituted an "appeal to local prejudice," an invitation to disregard the instruction on agency, and an attempt to persuade "the jury to base its decision on something other than the evidence." We quote from Hospital's point the arguments it claims were prejudicial and mandate reversal: [13]

(A) "[Hospital] is, in fact, a Nashville Corporation, a publicly-held corporation;"

(B) "[Hospital] takes '$25,000 a month out of Pemiscot County;' "

(C) "[I]dentity of directors;"

(D) "S.C. Management is a 'fictitious name' and it's a sham [14] [sic] and it stinks.... "

In "the 'rough and tumble' tactics of trial, zealous counsel may overstep the bounds of propriety in argument," but not every indiscretion should "automatically result in a mistrial." *Gilmore v. Union Construction Company,* 439 S.W.2d 763, 766[4] (Mo.1969). For this reason, the rule has always been that a timely and *sufficient* objection must be made to closing argument so that the trial court can take corrective measures to remove the prejudice. *MFA Incorporated v. Dettler,* 817 S.W.2d 658, 662 (Mo. App.1991). Ordinarily, a party whose only response is "I object," or who otherwise fails to advise the court of the basis of the objection, preserves nothing for review. *Gilmore,* 439 S.W.2d at 767[8]; *MFA,* 817 S.W.2d at 662.

In this case, defense counsel's response to argument (A) was:

"[Defense Counsel]:˙ Oh, come on, Judge, that's really, a Nashville corporation, that's really uncalled for.

THE COURT: Overruled, this is closing argument.... You may proceed.

[Defense Counsel]: Can I just have a continuing objection so I don't have to object?

---

13. We have assigned the letters "A," "B," "C," and "D" to the arguments for purposes of identification in our analysis of Point IX.

14. Hospital's point misstates the argument made. Plaintiff's counsel argued "[i]t's a *shame*" rather than "[i]t's a *sham* ...."

THE COURT: It will be shown for the record...."

Such responses were no more than "I object," and under the circumstances, preserved nothing for review. *See Gilmore*, 439 S.W.2d at 767[8].

■ Regarding argument "B," defense counsel's only request of the trial court took this form: "Judge, I just have to ask for a mistrial. I mean, what else is that but an outright appeal to prejudice." The trial court overruled that objection, assuming the statement can properly be called that, but we do not know why. The trial court may have considered the objection insufficient, which it was. On the other hand, the trial court might have regarded the argument as not unfair or prejudicial since Hospital elicited testimony on this subject matter during its cross examination of Hospital's chief financial officer. Also, the trial court may have viewed the argument as improper but that it did not warrant the drastic remedy of mistrial. "Improper statements in oral argument may be cured, in given circumstances, by withdrawal, reprimand or admonition, or by an instruction to the jury." *Gilmore*, 439 S.W.2d at 766[6]. As defense counsel's only request was for a mistrial, we will not convict the trial court of error for not applying one of the other curative remedies. The necessity of the drastic remedy of a mistrial rests in the sound discretion of the trial court, and absent a manifest abuse of that discretion, appellate courts should not interfere. *Kinser v. Elkadi*, 674 S.W.2d 226, 236–37[13] (Mo. App.1984). Here, we defer to the trial court's evaluation of this incident. *See Gilmore*, 439 S.W.2d at 767. For all of the above reasons, we conclude that Hospital's contentions concerning argument "B" do not merit a new trial.

Argument "D" and Hospital's objection to it proceeded as follows:

"[Plaintiff's counsel]: The instructions, and I'll tell you what, I mentioned this in Voir Dire, which is when I first talked to you all, that Twin Rivers Regional Medical Center is a fictitious name, that it's S.C.

Management Inc., doing business. I'll tell you what's fictitious in my opinion is this contract that has stamped on it Clinics Holdings. Also the deal that they're claiming [Physician] has. That's what's fictitious. It's a shame, and it stinks. It stinks to high heaven.

"[Defense counsel:] Come on, Judge, he abandoned that claim. That's all uncalled for, it's improper argument. He abandoned the claim to this Court, did not instruct on it, now he's arguing. I respectfully insist on a mistrial. That's totally uncalled for."

Again, the trial court treated Hospital's response to argument "D" as an objection and overruled it. The record does not disclose whether the trial court viewed the objection as insufficient, which it was, or considered the remedy of mistrial too drastic under the circumstances. In either event, the reasons we gave in disposing of argument "B" and the principles there discussed persuade us that Plaintiff's contentions as to argument "D" do not merit a new trial.

■ Finally, in regard to argument "C," Hospital develops nothing in the argument section of its brief to show how the "identity of director" argument prejudiced Hospital. The single sentence of argument devoted to this issue reads: "The trial Court allowed [Plaintiff] to argue the identity of directors ... and allowed him to argue outside the pleading." When matters referenced as alleged error in a point relied on are not developed in the argument portion of a brief, they are deemed abandoned. *See Haynam v. Laclede Electric Cooperative, Inc.*, 889 S.W.2d 148, 155 (Mo.App.1994). We deny Point IX.

*Sufficiency of Evidence on Agency Issue*

In Point X, Hospital alleges error in the trial court's failure to grant its motions for directed verdict at the close of Plaintiff's case and at the close of all the evidence, in that Plaintiff had failed to present evidence of an agency relationship between Physician and Hospital. In analyzing Point X, we simulta-

neously address the portion of Hospital's Point VIII which argues that Plaintiff's verdict directing instruction was not supported by the evidence since no evidence of agency existed.

The appropriate standard of review for such assignments of error is stated in *Eichelberger v. Barnes Hospital*, 655 S.W.2d 699, 704 (Mo.App.1983) (citations omitted):

> "[T]he appellate court will review the evidence presented at trial and will determine whether or not the plaintiff has introduced substantial evidence that tends to prove the facts essential to plaintiff's recovery. If the plaintiff has introduced such substantial evidence, the trial court will not be found to have committed reversible error.... In reaching this determination, we must review the evidence in the light most favorable to the plaintiff, giving him the benefit of all reasonable inferences, and disregarding the defendant's evidence except as it aids the plaintiff's case."

As to both the instruction and the directed verdict motions, Hospital challenges the existence of evidence of an agency relationship between Hospital and Physician, so we restate its required elements: "(1) the principal must consent, expressly or impliedly, to the agent's acting on the principal's behalf, and (2) the agent must be subject to the principal's control." *Wray v. Samuel U. Rodgers' Community Health Center., Inc.*, 901 S.W.2d 167, 170 (Mo.App.1995).

■ We recite certain facts drawn from the record to demonstrate that there was sufficient evidence of an agency relationship between Physician and Hospital on April 5, 1993, to submit the issue to a jury.

David Lynn, Hospital's chief financial officer, testified that in 1991 Hospital "undertook a campaign to recruit doctors" to Caruthersville, Missouri. As part of the program, Hospital used two types of contracts to offer "financial inducements to ... young doctors." In part, it was Hospital's recruitment efforts that caused Physi-

cian to go to Caruthersville in 1991 to begin the practice of medicine.

At trial, Physician admitted that he "had a contract with someone since [he] started working in [the Caruthersville] area." Whatever contract Physician was working under on April 5, 1993, it was never produced or offered into evidence. Physician explained its absence thusly:

> "Q. [To physician:] You knew I was going to ask you about this contract that you had with Twin Rivers; did you find that previous contract in your home when you were looking at home this weekend?
>
> A. Not the previous one, just *this one*.
>
> Q. You did not have a copy of the *earlier one?*
>
> A. I didn't think it was significant. I didn't look for it." (Emphasis ours.)

The contract referred to in Physician's testimony as "this one" [exhibit 2] was the only document in evidence that described the contractual relationship under which Physician performed his professional services in Caruthersville, Missouri. We digress in our discussion at this point to detail testimony about exhibit 2 and its genesis. This is necessary because Physician was frequently asked at trial to compare exhibit 2 with his original contract.

Exhibit 2 is a document entitled "Clinic Physician Agreement" and by its terms, Physician was employed to practice medicine for a firm called "Clinic Holdings, Inc.," for a term of three years, beginning April 15, 1993. It provides evidence that Physician's employment by Clinic Holdings, Inc., came ten days *after* Physician allegedly failed to properly diagnose Plaintiff on April 5, 1993. Exhibit 2 also explicitly declared under its provisions that, Physician was "a bona fide employee of [Clinic Holdings, Inc.]."

As explained by David Lynn in his testimony and by defense counsel in closing argument, Clinic Holdings, Inc. was "formed because Medicare and Medicaid laws wouldn't let hospitals hire doctors." Clinic Holdings .

was incorporated March 18, 1993, and according to Lynn, it is used "to employ the clinic physicians." Ornda Health Corporation owns both corporations, that is, Defendant (S.C. Management, Inc., d/b/a Twin Rivers Regional Medical Center) and Clinic Holdings, Inc.

With that background, we recite and summarize portions of Physician's testimony concerning the contract under which he operated before April 15, 1995.

"Q. I asked you one of the inducements, and I said you get $10,000 a month for 4 and a half day work schedule under this contract [Exhibit 2]; now is that right?

A. Under this contract [Exhibit 2], right.

Q. $10,000 a month?

A. Yes.

Q. How much did you get when you first came to Twin Rivers?

A. It was about half.

Q. ... Same work schedule?

A. Yes.

Q. *Similar contract?*

A. *As best I can remember, yes.* (Emphasis ours.)

. . . .

Q. Under the contract that you had prior to the one that you hold in your hands since you came here, you've said it was a similar contract, but it just [had] some change in the dates, whoever had that contract controlled the billing just like this contract?

A. I believe so.

Q. Whoever had this contract before controlled your work schedule?

A. As far as I know, I don't know have [sic] this contract with me, I can't say for sure."

Also, Physician testified that under the contract that preceded exhibit 2, he was paid a salary and provided with an office, supplies, and equipment. Moreover, under both contracts, Physician "referred [his] patients ... to Twin Rivers Medical Center."

Testimony of David Lynn, Defendant's chief financial officer, included this:

"[I] administer this contract [exhibit 2] over there at Twin Rivers ... [and] ... there's really been no change in the way [Physician's] clinic has been handled with Twin Rivers after the dates of this clinic-physician agreement April the 15th, 1993, *it's basically the same deal as it was when [Physician] first arrived in Pemiscot County in 1991.*"

Finally, we note Henry Hayden's testimony that he owned a building in Caruthersville in which was located the "Caruthersville Clinic at which [Physician] practiced." From May 15, 1991, when Physician first occupied the premises, and continuing through the date of trial, Defendant was the lessee and Defendant paid the rent, rather than Physician.

We conclude that the foregoing provides sufficient evidence from which a jury could reasonably infer that Physician had a contract with Hospital on April 5, 1993, in which Hospital expressly consented to Physician acting on its behalf in the practice of medicine. Clinic Holdings did not exist until March 18, 1993, whereas Hospital was in existence before 1991. Moreover, according to the testimony of Hospital's chief financial officer, Hospital had recruited Physician to come to the Caruthersville clinic in 1991, paid him a monthly salary, and paid all the expenses of the clinic, including rent, utilities, and staff. Testimony that describes Physician's original contract as "similar" to Plaintiff's Exhibit 2 and that "there's really been no change" under the April 15, 1993, contract, provided evidence from which the jury could reasonably infer the existence of an agreement for Physician to act on behalf of Hospital.

Having determined that Plaintiff had introduced substantial evidence tending to prove

the first prong of the agency relationship, we turn now to the second, whether Physician was subject to Hospital's control. Hospital agrees that the elements required to establish control or a right to control are stated by *Keller v. Missouri Baptist Hospital,* 800 S.W.2d 35 (Mo.App.1990). Hospital's only objection to the sufficiency of the evidence to establish this second prong is that no contract existed between *Hospital* and Physician at the time of the negligent acts or omissions. In fact, in its reply brief, Hospital admits that the April 15, 1993, contract between Physician and *Clinic Holdings* establishes the control prong of an agency relationship between those two entities: "The contract manifested all of the control required by *Keller, supra,* and more. But where is the control or right to control from the hospital?" As has already been established, Plaintiff introduced substantial evidence which tended to prove that Physician's contract on April 5, 1993, was with Hospital, not Clinic Holdings. Therefore, the only remaining question is whether that contract also manifested the control required by *Keller.* As Physician testified: "[f]rom what I understand, the only changes were the date, um, the payroll, and I believe that was it." Thus, a reasonable jury could infer that on April 5, 1993, Physician was working under a contract virtually identical to the April 15, 1993, contract, with changes in only the names, date, and payroll. Therefore, that contract, by Hospital's own admission, and also by our review of exhibit 2, manifested all the control required by *Keller,* thus establishing the second prong of the agency relationship at the relevant time. The trial court did not err when it failed to grant Hospital's motions for directed verdict at the close of Plaintiff's case and at the close of all the evidence. Neither did it err in giving Plaintiff's verdict directing instruction, which was supported by the evidence. We deny Point X and that portion of Point VIII which alleges that Plaintiff's verdict directing instruction was unsupported by the evidence.

We affirm the judgment in No. 20055.

### CASE NO. 20103—PHYSICIAN'S APPEAL

Before the Physician/Plaintiff settlement occurred, Hospital cross-claimed against Physician for any sums that Hospital might be forced to pay because of its derivative liability for Physician's negligence. After the settlement, the trial court dismissed Plaintiff's action against Physician on November 1, 1994. Physician then moved for a separate trial of Hospital's cross-claim. Once judgment was entered for Plaintiff against Hospital pursuant to a jury verdict, Hospital moved for summary judgment on its cross-claim against Physician. The trial court sustained Hospital's motion and entered judgment against Physician for $245,500 (jury verdict after credit for settlement), plus attorneys fees, expenses, and court costs. It is from this judgment that Physician appeals in No. 20103.

Physician raises two points of error in his appeal. The first alleges that the release, concededly granted Physician by Plaintiff, discharged him from all liability for contribution and indemnity. The issue which controls this point is a choice between two statutes: § 538.230, RSMo 1994, which the trial court did not apply; and § 537.060, RSMo 1994, which it did.

Our analysis and the conclusions we reached in rejecting Hospital's second point in No. 20055 dispose of Physician's first point. Apportionment is ill-suited for cases where a party's liability for negligence is solely derivative. "The liability of a master for the acts of a servant ... within the scope of the employment ... stands upon grounds that do not support apportionment." W. Page Keeton et al., *PROSSER AND KEETON ON THE LAW OF TORTS* § 52 at 346 (5th ed.1984). *See also American National,* 181 Ill.Dec. at 921, 609 N.E.2d at 289; *Mas,* 555 N.Y.S.2d at 674, 554 N.E.2d at 1262.

As Hospital's liability was solely derivative, § 538.230 is inapposite. Here, there is only a basis for indemnity under § 537.060, not for apportionment of fault under § 538.230. We deny Physician's first point.

In his second Point, Physician charges that the trial court erred in entering summary judgment for Hospital because

Hospital had not yet made payment to Plaintiff and therefore had not sustained an actual loss. We disagree. *Burns & McDonnell Engineering v. Torson Construction,* 834 S.W.2d 755 (Mo.App.1992), teaches that neither payment by Hospital nor a showing of actual loss is a necessary prerequisite for the court to have entered judgment on Hospital's claim for indemnity:

> "If the indemnity is against liability, the cause of action accrues as soon as liability occurs, and *no actual loss need be shown* .... However, this type of indemnity cannot accrue until an indemnitee's liability has become 'fixed and established.' ... The mere assertion of a claim against the indemnitee does not 'fix and establish' liability, but only subjects the party to potential liability *to be determined with the outcome of the lawsuit.* Therefore, a cause of action for indemnity against liability cannot accrue *until the claim against the indemnitee is completely resolved.* Only then is the party's liability 'fixed and established.'"

*Id.* at 758[4] (emphasis ours, citations omitted).

Contrary to Physician's argument, *Burns* clearly indicates that no actual loss need be shown. Application of *Burns* demonstrates the maturity of Hospital's indemnity claim. After settling with Physician and dismissing him from the case, Plaintiff tried his claim against Hospital to conclusion. This resulted in a judgment entry against Hospital for $245,500 (net after deduction of settlement sum). Thus, Hospital's liability on the judgment stood at $245,500. At this point, the claim against the indemnitee, Hospital, had been completely resolved, thus making Hospital's liability "fixed and established." As the cross-claim of Hospital was mature, the trial court did not err when it granted Hospital's motion for summary judgment. We deny Physician's second point.

We affirm the judgment for Hospital on its cross-claim against Physician in No. 20103.

CROW and PARRISH, JJ., concur.