Larry KEYSER, et al., Respondents,

v.

Genevieve W. KEYSER, Respondent,

Hollis Foley, Appellant.

No. WD 59894.

Missouri Court of Appeals,
Western District.

May 14, 2002.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 2, 2002.

Application for Transfer Denied
Aug. 27, 2002.

Michael B. Lowe, Overland Park, KS, for Respondents Larry & Dwaine Keyser.

Frank J. Murphy, Kansas City, for Respondent Genevieve Keyser.

Wm. N. Marshall III, Kansas City, for Appellant Hollis Folley.

Before ELLIS, P.J., and EDWIN H. SMITH and HOWARD, JJ.

EDWIN H. SMITH, Judge.

Hollis Foley appeals the judgment of the Probate Division of the Circuit Court of Jackson County adjudicating her mother, the respondent Genevieve Keyser (mother), as being totally incapacitated and disabled, as defined in § 475.010,[1] and appointing the Jackson County Public Administrator the guardian of her person and conservator of her estate, in accordance with § 475.079. The judgment was rendered on the joint petition of the appellant's brothers, respondents Dwaine H. Keyser and Larry L. Keyser (the brothers).

The appellant raises two points on appeal. In Point I, she claims that the trial court erred in admitting, over her objection, the testimony of her brothers' expert witness, Dr. John Wisner, and finding that her mother was totally incapacitated and disabled and in need of a guardian and conservator because the record was insufficient to establish the requisite foundation for admission of such evidence. In Point II, she claims, in the alternative, that even if we find in Point I that the trial court did not err in finding that her mother was in need of and appointing a guardian and conservator, it nonetheless erred in appointing the public administrator as such, and not the appellant, based upon its ruling that the durable power of attorney executed by her mother appointing the

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

appellant her attorney-in-fact and nominating her for appointment as her mother's guardian and conservator was a nullity because the court's finding as to why the power of attorney was a nullity, that the appellant's mother lacked the mental capacity to execute it, was not supported by the record.

We affirm.

### Facts

On October 18, 2000, the appellant's brothers filed a joint petition to appoint a guardian and conservator for their mother. The petition alleged that their mother, who at the time was an 84–year–old widow, whose husband, Claude, had died in April of 1995, was suffering from dementia and a decline in overall intellectual functioning and that, as such, she lacked the capability to care for herself and to manage her considerable financial resources.

Larry Keyser had assisted both of his parents in financial matters prior to his father's death and was named successor trustee for the trusts that his father had established for both himself and his wife. Larry continued to help his mother with financial matters after his father's death. In June of 1996, he assisted his mother as she looked into different living arrangements offered by John Knox Village, a retirement complex. One of the available options was guaranteed lifetime care, but, in order to qualify for this option, his mother had to undergo an interview with a John Knox employee. After the interview, his mother was turned down as a suitable applicant for this option because it was apparent that she was suffering from some Alzheimer's-like impairment in the form of memory loss. At trial, Larry testified that he had noticed that his mother suffered from some kind of dementia long before the incident with John Knox Village. His mother eventually did lease an apartment

at John Knox Village, under different living arrangements, where she lived until June of 1997, when she moved in with the appellant, who was living at Lake Winnebago.

On April 8, 1997, the appellant took her mother to an attorney for the purpose of executing a durable power of attorney naming the appellant as attorney-in-fact and nominating her for appointment as the mother's guardian and/or conservator. On the same date, the appellant's mother amended her trust instrument naming the appellant successor trustee. At that time, the appellant knew that her mother had been turned down for the lifetime care program at John Knox Village because she suffered from an Alzheimer's-like memory loss; however, the appellant did not inform the attorney handling these legal matters of this fact. In addition, the appellant obtained loans and gifts from her mother's assets totaling $140,000, and she influenced her mother so as to alienate her from the rest of her family. The appellant's conduct resulted in a considerable amount of dissension between the appellant and her siblings.

The mother was still living with the appellant when the joint petition of the appellant's brothers to appoint a guardian and conservator was filed. Several months later, on December 1, 2000, the mother was examined by Dr. John Wisner, the Director of Inpatient Psychiatry at the University of Kansas Medical Center. Dr. Wisner described the nature of this examination when he testified at trial on the petition:

Q. On page 1 of your exhibit, you have a mental status examination. Can you tell the court what that is?

A. Sure. It's the standard set of questions that are used by psychiatrists along with observations of a person's demeanor and speech and be-

havior in order to assess mental processes that are going on at the time.

Q. Did you perform these common questions with Mrs. Keyser?

A. I made these observations, made these inquiries and performed the usual steps that go into a mental status exam.

Dr. Wisner also stated that the examination was conducted "to establish her capacity for memory, her capacity for taking in and understanding and using information and recalling old information."

Dr. Wisner testified that the mother did not know the current day, month, or year, could not tell him what medications she was taking, and could not name the President of the United States. After some hesitation, she said the year was 2000, but then changed her answer, saying "2000, no, no, no, 200." The mother did not know her age, and it took her four attempts to state her birthday. She could not do serial subtractions of the number seven. When asked to do serial subtractions of the number three, starting at twenty, she could give the answer for the first three subtractions, then could no longer recall what she had been asked to do.

In addition, Dr. Wisner told the mother three unrelated words and asked her to remember them. Thirty seconds later he asked her what those words were, and she could not remember. She also could not name her children or state their birth dates, and she could not remember the names of her grandchildren. The mother could not remember the date or year that she was married, the duration or details of her employments, or the date of her husband's death. She also could not tell how much time had passed during the examination, estimating that they had been talking for fifteen or twenty minutes when they

had, in fact, been talking for forty-five minutes.

The mother knew that she lived with the appellant at Lake Winnebago, but she couldn't give the address, and she could not say how long she had lived there. To test how suggestible she might be, Dr. Wisner got her to agree that she had been living with the appellant at Lake Winnebago for two months, then for three months, then six months, and then twelve months. The mother did not have any idea what her monthly income or current expenses were. When Dr. Wisner asked her what a power of attorney was, she did not know, and when he asked her if she remembered ever signing one, she said no.

At trial, Dr. Wisner was asked if he had made a diagnosis of the mother:

Q. What was your diagnosis?

A. Dementia.

Q. In your report you say dementia of unknown cause but probably of Alzheimer's type. What do you mean by that?

A. Well, in the absence of x-ray and laboratory studies that would give me the specific status of various portions of Ms. Keyser's brain at this point in time, I can only diagnose the global diagnosis of dementia, so I can't specify as to cause; however, I can rule out, given the materials that I've subsequently examined since examining her, the records that I have seen, I can rule out many, in fact most of the common causes of dementia other than Alzheimer's disease.

Dr. Wisner further stated that, in this case, the dementia was "very far advanced and severe." Dr. Wisner added that, in arriving at this diagnosis, he reviewed medical records from a variety of sources, including the records of Dr. Michael Cooper, who indicated that the mother was

showing the initial manifestations of Alzheimer's disease as early as 1991, and the records of John Knox Village and Research Belton Hospital, which further documented her memory loss.

Dr. Wisner was also asked whether, in or around April of 1997, the mother would have had the capacity to execute a durable power of attorney. Dr. Wisner replied:

It's my opinion that dementing illness was in progress at that time, was present at that time and that she would not have had the capacity to understand the nature of a durable power of attorney or the effect of a durable power of attorney, and this is based, of course, on some degree of extrapolation between the onset of her illness and its first signs and the context in which those signs were first noted and the severity of her illness, and also the lack of evidence of certain types of causality at the time of my examination, so on that basis I'm certain that she would not have had that capacity in 1997.

The medical records of Dr. Cooper also supported the trial court's finding that the mother was totally incapacitated and disabled, as they indicated that the mother was showing the initial manifestations of Alzheimer's disease as early as 1991.

At the conclusion of the hearing, the probate court found that the mother was totally incapacitated and disabled, as defined in § 475.010, and therefore legally disabled without exception, as provided by § 475.078.2, and appointed the Jackson County Public Administrator, Rebecca Wood, guardian of her person and conservator of her estate, pursuant to § 475.079, denying the appellant's and the brothers' requests to be so appointed. In so doing, the trial court made the following finding about the durable power of attorney, which the mother had executed in favor of the appellant and in which she nominated the appellant to be her guardian and conservator:

The existence of respondent's mental incapacity at the time she executed the power of attorney on April 8, 1997, renders the authority of Ms. Foley as attorney in fact a nullity. Therefore, paragraph II, M. of the power instrument, Exhibit No. 8, providing that Ms. Foley shall have priority to be appointed respondent's guardian or conservator or to nominate a successor or substitute guardian or conservator is of no force or effect.

The trial court made the further finding that, because of the appellant's conduct, which included using undue influence in obtaining loans and gifts from her mother's assets, totaling $140,000, and isolating and attempting to alienate her mother from the rest of her family, she was not a suitable candidate to serve as her guardian or conservator. In denying the brothers' request to be appointed their mother's guardians and conservators, the court cited the dissension between them and the appellant.

This appeal follows.

## Standard of Review

■ Review of a probate court's rulings in a proceeding to appoint a guardian or conservator is governed by *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. *banc* 1976). *In re Turnbough,* 34 S.W.3d 225, 226 (Mo. App.2000). Under this standard, we are to affirm the judgment of the probate court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.*

## I.

■ In Point I, the appellant claims that the trial court erred in admitting, over her objection, the testimony of her broth-

ers' expert witness, Dr. John Wisner, and finding that her mother was incapacitated and disabled and in need of a guardian and conservator because the record was insufficient to establish the requisite foundation for admission of such evidence in that "there was no evidence that his testimony was based upon facts or data of a type reasonably relied upon by experts in his field and otherwise reasonably reliable, or upon a scientific principle sufficiently established to have gained general acceptance in his field." The appellant's claim is without merit.

■ The standard for the admissibility of expert opinion testimony is set forth in § 490.065.3, which provides that "[t]he facts or data in a particular case upon which an expert bases an opinion or inference ... must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable." "To satisfy the statute, a litigant must establish that experts within a specialized area customarily and reasonably rely on the facts or data on which the testifying expert is relying for his or her opinion and that the facts or data are reasonably reliable." *Schreibman v. Zanetti,* 909 S.W.2d 692, 698 (Mo.App.1995).

"Although a trial court has the independent responsibility to decide if the foundational facts meet the minimum standards of reliability as a condition of the admissibility of the opinion, it is also true that a trial judge is expected to defer to the expert's assessment of what data is reasonably reliable." *Glidewell v. S.C. Mgmt., Inc.,* 923 S.W.2d 940, 951 (Mo.App. 1996) (citation omitted). It is only in those cases where the source upon which the expert relies for opinion is so slight as to be fundamentally unsupported, that the finder of fact may not receive the opinion. *Id.*

Dr. Wisner testified that his diagnosis of the appellant's mother was based upon the examination, which he conducted in December of 2000, and upon medical records that he consulted which included the medical records of Dr. Cooper, Research Belton Hospital, and John Knox Village. Dr. Wisner described the examination as consisting of "the standard set of questions that are used by psychiatrists along with observations of a person's demeanor and speech and behavior in order to assess mental processes that are going on at the time." He also went into considerable detail as to the questions asked and the mother's responses thereto, and explained how they revealed deficits in her capacity for memory, her capacity for taking in and understanding and using information, and her capacity for recalling old information. Dr. Wisner also detailed the medical records he consulted in forming his diagnosis, which included the medical records of Dr. Cooper, Research Belton Hospital, and John Knox Village. Medical records are the quintessential example of the types of facts or data reasonably relied upon by experts in the field of medicine. *Id.*

Given Dr. Wisner's description of the examination as the "standard" set of questions relied upon by other experts in his field of specialty, his detailed account of what the examination revealed, and his description of the medical records he consulted, the source for his opinion was not so slight as to be fundamentally unsupported, so it was appropriate for the trial judge to defer to his assessment of what data was reasonably reliable, and it was appropriate for the fact finder to receive the opinion. *Id.*

■ On appeal, we review the trial court's decision to admit expert testimony for an abuse of discretion. *Whitman's Candies, Inc. v. Pet Inc.,* 974 S.W.2d 519, 527 (Mo.App.1998). Under this abuse of

discretion standard, we will reverse the trial court's decision to admit Dr. Wisner's testimony only if the ruling is so arbitrary and unreasonable as to shock our sense of justice and indicate a lack of careful consideration. *Id.* For the reasons stated above, there was no such abuse of discretion in the case before us.

Point denied.

## II.

In Point II, the appellant claims, in the alternative, that even if we find in Point I that the trial court did not err in finding that her mother was in need of and appointing a guardian and conservator, it nonetheless erred in appointing the public administrator as such, and not the appellant, based upon its ruling that the durable power of attorney, executed by her mother appointing the appellant her attorney-in-fact and nominating her for appointment as her mother's guardian and conservator, was a nullity because the court's finding as to why the power of attorney was a nullity, that the appellant's mother lacked the mental capacity to execute it, was not supported by the record. Specifically, the appellant claims that the record would only support the conclusion that her mother had the necessary mental capacity to execute the power of attorney, which nominated the appellant as her mother's guardian and conservator such that, pursuant to the priority given to such nominations by § 475.050.1(2), the court would have been obligated to appoint the appellant her mother's guardian and conservator. We disagree.

Section 475.050 sets out the hierarchy for the trial court to follow in appointing a guardian or conservator. *In re Estate of Korman,* 945 S.W.2d 10, 12 (Mo.App.1997). Section 475.050.1 provides that:

*[b]efore appointing any other eligible person as guardian of an incapacitated person, or conservator of a disabled person, the court shall consider the suitability of appointing* any of the following persons who appear to be willing to serve:

(1) If the incapacitated or disabled person is, at the time of the hearing, able to make and communicate a reasonable choice, any eligible person nominated by the person;

(2) *Any eligible person nominated in a durable power of attorney executed by the incapacitated or disabled person,* or in an instrument in writing signed by the incapacitated or disabled person and by two witnesses who signed at the incapacitated or disabled person's request, *before the inception of the person's incapacity or disability,* at a time within five years before the hearing when the person was able to make and communicate a reasonable choice;

(3) The spouse, parents, adult children, adult brothers and sisters and other close adult relatives of the incapacitated or disabled person;

(4) Any other eligible person or, with respect to the estate only, any eligible organization or corporation, nominated in a duly probated will of such a spouse or relative executed within five years before the hearing.

(Emphasis added.) These statutory preferences are not absolute and are subject to the sound discretion of the trial court. *In re Estate of Wood,* 852 S.W.2d 867, 868 (Mo.App.1993).

Under § 475.050.1, a person nominated by the alleged incapacitated and incompetent person is given first priority, provided the alleged incapacitated and incompetent person was at the time of nomination able to make and communicate a reasonable choice. § 475.050.1(1). Second priority is then given to a person nominated in a

durable power of attorney executed by the alleged incapacitated and incompetent person. § 475.050.1(2). However, by its express terms, this preference does not apply where the person is found to have lacked the required mental capacity to execute the durable power of attorney. § 475.050.1(2).

In this case there was clear and convincing evidence for the trial court to find, as it did, that the mother was incapacitated in April of 1997 when she executed the power of attorney, such that she did not understand the significance of her execution of the durable power of attorney. This evidence included the expert opinion testimony of Dr. Wisner, medical records dating back to 1991, and the testimony of lay witnesses, including Larry Keyser. When he testified at trial, Dr. Wisner was asked whether, in or around April of 1997, the mother would have had the capacity to execute a durable power of attorney. Dr. Wisner replied:

> It's my opinion that dementing illness was in progress at that time, was present at that time and that she would not have had the capacity to understand the nature of a durable power of attorney or the effect of a durable power of attorney, and this is based, of course, on some degree of extrapolation between the onset of her illness and its first signs and the context in which those signs were first noted and the severity of her illness, and also the lack of evidence of certain types of causality at the time of my examination, so on that basis I'm certain that she would not have had that capacity in 1997.

■ The medical records of Dr. Cooper also supported the trial court's finding of incapacity at the time of execution of the durable power of attorney, as they indicated that the mother was showing the initial manifestations of Alzheimer's disease as early as 1991. The trial court's finding was further supported by the testimony of the mother's son Larry, who indicated that, prior to 1997, there were numerous instances where she displayed signs of her dementia, including situations where she would not recognize a duplex that she had just visited after driving around the block and forget that she had been in the lower level of his house immediately after going upstairs and then coming back down. Testimony of the protectee's children regarding the protectee's activities and that of providers of care can justify a trial court's inference that the incapacitated person was incapacitated at the time of the execution of a durable power of attorney, even where there is no direct evidence as to lack of capacity on the date that the power of attorney was executed. *Couch v. Couch*, 824 S.W.2d 65, 71 (Mo.App.1991).

■ Even if there was insufficient evidence to support a finding that the durable power of attorney was executed by the mother after the inception of her incapacity or disability, the trial court still did not err in appointing the public administrator, rather than the appellant, to be the mother's guardian and the conservator of her estate. The statutory preferences for guardian or conservator are not absolute and do not control where the record discloses dissension in the family, interests adverse to the protectee, or any other reason why a stranger would best serve the interests of the protectee. *Id.* at 70–71; *Matter of Hancock*, 828 S.W.2d 707, 709 (Mo.App.1992). Here, there was sufficient evidence in the record to support the trial court's appointment of the public administrator rather than the appellant based on such a best interests determination. There was ample evidence of dissension in the family, as all of the siblings testified about the conflict among them, and about the deterioration of their rela-

tionship since the death of their father. There was also evidence that the appellant had interests adverse to her mother, as the trial court found that the appellant had used undue influence in obtaining loans and gifts from her mother's assets totaling $140,000, and that the appellant isolated and attempted to alienate the mother from the rest of her family.

The decision of whom to appoint as conservator or guardian lies within the sound discretion of the trial court. *In re Estate of Wood*, 852 S.W.2d at 868. We cannot conclude under the circumstances that the trial court abused this discretion in appointing the public administrator, rather than the appellant, the guardian and conservator of the appellant's mother.

Point denied.

### Conclusion

The judgment of the Probate Division of the Circuit Court of Jackson County adjudicating the respondent, Genevieve Keyser, as being totally incapacitated and disabled, as defined in § 475.010, and appointing the Jackson County Public Administrator the guardian of her person and conservator of her estate, is affirmed.

ELLIS, P.J., and HOWARD, J., concur.