In the Matter of the Care and Treatment of Michael GODDARD, Appellant,

v.

STATE of Missouri, Respondent.

No. 25799.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 10, 2004.

Motion for Rehearing and Transfer Denied Aug. 31, 2004.

Application for Transfer Denied Oct. 26, 2004.

Emmett D. Queener, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Amy E. Randles, Office of Atty. Gen., Jefferson City, for respondent.

KENNETH W. SHRUM, Judge.

This is a "Sexually Violent Predator" commitment case, authorized via sections

632.480 to 632.513 (the "Act").[1] In accord with a jury verdict, Michael Goddard ("Appellant") was adjudged to be a sexually violent predator and was ordered confined by the Department of Mental Health ("DMH").

On appeal, Appellant argues that the trial court made a prejudicially erroneous evidentiary ruling by allowing "testimony regarding risk prediction based on the results of actuarial instruments." He insists that admission of this evidence violated section 490.065, the statute governing expert testimony in civil cases. He also claims instructional error was committed at trial. Finally, Appellant maintains the court erred in denying his "motion to dismiss the petition against him as a means of enforcing the plea agreement entered into between himself and the State." This court affirms.

## RELEVANT PROVISIONS OF THE ACT

The Act defines a "sexually violent predator" as a person suffering from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility *and* who has previously pled guilty or been found guilty of a sexually violent offense. § 632.480(5), RSMo Cum. Supp. (2001). A "mental abnormality" is defined as a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to commit sexually violent offenses in a degree that causes the individual serious difficulty in controlling his behavior. § 632.480(2), RSMo Cum.Supp. (2001); *Thomas v. State*, 74 S.W.3d 789, 792[3] (Mo.banc 2002).

If a court or jury determines beyond a reasonable doubt that a person is a sexual-ly violent predator as defined in the Act, such person "shall be committed to the custody of the director of the department of mental health for control, care and treatment until such time as the person's mental abnormality has so changed that the person is safe to be at large." § 632.495, RSMo Cum.Supp. (2001).

## FACTS

Primarily, the testimony of Dr. Rintu Khan was used to prove Appellant was a sexually violent predator. Moreover, Appellant's first point charges that some of Dr. Khan's testimony was erroneously admitted over Appellant's objection. Since his other two points do not involve testimony adduced at the trial, nor do they challenge the sufficiency of the evidence, we only recount Dr. Khan's testimony at this point.

Dr. Khan testified that Appellant "suffers from a mental abnormality, namely pedophilia, sexually attracted to males." Because of that abnormality, Appellant has "serious difficulty controlling his behavior." He based this diagnosis and opinion on a number of factors including Appellant's conduct in the past. Appellant's history revealed he began having a sexual interest in young boys when he was fifteen years old. At that age, Appellate molested a boy between the ages of seven and eight.

Then in 1989, when Appellant was eighteen, he sodomized an eleven-year-old boy. He pled guilty to sodomy and "was sentenced to four years suspended, fifty days shock jail time, then probation." His probation conditions included a requirement that he attend "sex offenders treatment" and that he not be alone with children under the age of seventeen. During this probation period, Appellant began dating Teresa Cade, a mother of three children

---

1. All statutory references are to RSMo (2000), unless otherwise indicated.

(each under the age of ten). After four probation violations stemming from his contact with Cade's children and his refusal to participate in treatment programs, he was sent to the Fulton State Hospital for in-patient treatment.

Approximately one month later, in August of 1992, Appellant admitted to molesting Cade's six-year-old son "several times." At the same time, he admitted to molesting two other boys. In September 1992, he was kicked out of the Fulton treatment program for failing to participate and totally lacking remorse for his crimes. Finally, in October 1992, Appellant's probation was revoked and he was ordered to serve the four-year sentence.

In November 1992, he pled guilty to the sodomy of Cade's son and was sentenced to ten years in prison to be served concurrently with the original four-year sentence. During Appellant's incarceration from 1992 to 2001, he refused any kind of sexual offender treatment. He repeatedly asserted he did not need the treatment and blamed others for his current situation.

When asked whether Appellant would recidivate, Dr. Khan testified it was his opinion, within a reasonable degree of medical certainty, that because of Appellant's mental abnormality, he was "more likely than not to engage in future predatory acts of sexual violence" if not confined for treatment. He reached this conclusion based on the following: (1) Appellant's track record and history; (2) Appellant's demeanor and denial of having a major problem; (3) Appellant's total lack of ef-

fort in addressing his problems; (4) Appellant's ability to deceive his probation officer while on probation, i.e., continuing to commit sexual crimes against boys; (5) Appellant's continued use of alcohol while on probation "when he claims alcohol had something to do with his previous offenses;" (6) Appellant's sexual assault of another inmate while in prison; and (7) Appellant's lack of family support.

While explaining why he believed Appellant was more likely than not to re-offend, Dr. Khan mentioned "actuarial instruments" that he considered, specifically one called "Static 99" and another denominated "MnSOST-R." Thereon, Appellant renewed his pre-trial objection to testimony about these instruments. As before, the trial judge overruled the objection and allowed Dr. Khan to continue. Dr. Khan then explained that the Static-99 and MnSOST-R are "actuarial instruments" derived from cross-sectional studies of sex offenders made throughout the country. These studies examined the characteristics of repeat sexual offenders and assigned them a score. By using this statistical study and comparing it with the characteristics of the person being tested, an evaluator can get a "rough estimate" of whether the test subject will re-offend.[2]

When asked if the Static-99 and MnSOST-R tests were "well accepted, widely used and generally accepted in your field for helping predict a person's future risk[ ]" potential, Dr. Khan replied:

"In our field these are the two that are widely used. But then again, I think the

---

**2.** As another explanation: "[T]he STATIC–99 is a risk assessment instrument that combines ten factors. An individual's scores on these factors are summed, and the total score is compared to a table that shows the reoffense frequencies associated with each score. The table indicates, for example, that a score of 5 is associated with a frequency of sexual recidivism (over a five year follow-up period) of

33%. The highest risk category shown on the table—scores of 6 or above—is associated with a measured frequency of sexual recidivism (over a 5 year period) of 39%." Eric S. Janus, *Examining Our Approaches to Sex Offenders & the Law: Minnesota's Sex Offender Commitment Program: Would an Empirically–Based Prevention Policy be More Effective,* 29 Wm. Mitchel L. Rev 1083, 1095–96 (2003).

majority of the clinicians base their evaluations on their opinion and just use the actuarials in a way to support them and not the other way around."

"Q. [To Dr. Khan] So you would have the same opinion whether or not you used any actuarials?"

"A. That is correct."

Dr. Khan also testified that these instruments are only used *after a diagnosis is completed* as a way to "support" that evaluation, and in his opinion, these instruments actually underestimated the risk of re-offending. Moreover, Dr. Khan unequivocally testified that his opinion (that Appellant was more likely than not to re-offend if left unconfined) would not change regardless of the score on the instruments.

A jury found Appellant was a violent sexual predator and the trial court entered a judgment committing him to the "control, care and treatment" of DMH. This appeal followed.

### Point I: Alleged Error In Admitting Evidence

■ Appellant's first point maintains the trial court abused its discretion when it allowed Dr. Khan to testify about risk prediction based on the use of actuarial instruments, i.e., the Static–99 and MnSOST–R. Specifically, he cites section 490.065 for the proposition that, as a prelude to allowing any testimony concerning those instruments, the State had to establish that the instruments and tests performed using those instruments were "reasonably relied upon by experts in the field in forming opinions" and had to be "otherwise reasonably reliable." He argues that no such showing was made and that any opinion based on these instruments was inadmissible because the instruments themselves were not "reasonably reliable to predict risk of sexual re-offense."

To determine the admissibility of expert testimony in civil cases in Missouri, "[t]he relevant standard is that set out in section 490.065." *State Bd. of Reg. Healing Arts v. McDonagh,* 123 S.W.3d 146, 153 (Mo. banc 2003). In pertinent part, that statute provides:

"1. In any civil action, if *scientific, technical,* or other *specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

. . . .

"3. The *facts or data* in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a *type reasonably relied upon by experts in the field* in forming opinions or inferences upon the subject and *must be otherwise reasonably reliable.*"

Section 490.065 (emphasis supplied).

Preliminarily, we observe that "[f]ew cases have interpreted section 490.065." *McDonagh,* 123 S.W.3d at 155. Until *McDonagh,* no court had clearly stated the standard for admission of expert testimony prescribed by section 490.065. That changed, at least in part, when *McDonagh* interpreted section 490.065.3, the "facts or data" prong of the statute.[3] We say in part, because *McDonagh* does not explicit-

---

3. In doing so, the *McDonagh* court pointed out that substantive differences exist between subsection 3 and the "facts and data" provision of the federal expert witness statute, i.e., Federal Rules of Evidence 703. 123 S.W.3d at 156. Since the approaches under FRE 703 differed from that prescribed in section 490.065.3, the standard set out in section 490.065.3 was said to govern. *Id.* at 155.

ly describe the standard set by section 490.065.1. Even so, *McDonagh* does provide this guidance regarding subsection one:

"To the extent that section 490.065 mirrors FRE 702 ..., interpreted and applied in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] and its progeny, the cases interpreting those federal rules provide relevant and useful guidance in interpreting and applying section 490.065."

. . . .

"The standard set out in section 490.065 is very similar to that initially adopted by the federal courts in *Daubert* and set out in FRE 702. Indeed, at the time *Daubert* was decided, FRE 702 was identical to section 490.065.1 ..., except that section 490.065.1 added a preliminary phrase '[i]n any civil action.'"

*McDonagh*, 123 S.W.3d at 155.

We hasten to note that Appellant's first point and the argument beneath it focuses almost exclusively on section 490.065.3, not section 490.065.1. We are persuaded, however, that Appellant is simply wrong when he claims the section 490.065.3 standard for admissibility governs here. The actuarial instruments (which Appellant says should have been excluded) are generally classified as scientific evidence.[4] Appellant concedes as much in his brief via his reliance on *Taylor*, 270 Ill.Dec. 361, 782

N.E.2d at 929 (holding, "the psychological or psychiatric testimony of an expert predicated upon actuarial instruments is scientific evidence"). More than that, Dr. Kahn's testimony reveals that he used the actuarial instruments as part of his general experience and knowledge (the reliability of which, as we understand it, is governed by the section 490.065.1 standard) and did not use those studies as part of the "facts and data" for this "particular case" (the reliability of which is governed by section 490.065.3).

If the test for admissibility of scientific evidence is prescribed by section 490.065.1 (as we believe it to be) and if the actuarial instruments are scientific evidence within the meaning of section 490.065.1 (which Appellant appears to concede), then we look to *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and its progeny for guidance in determining the standard for admissibility of the actuarial instruments and Dr. Kahn's testimony regarding them. We deem this appropriate because (1) as *McDonagh* stated, section 490.065.1 and FRE 702 (which *Daubert* interpreted) are essentially the same, *McDonagh*, 123 S.W.3d at 155; (2) the 2000 amendment to FRE 702 did not change the standard, it only codified the judicial interpretation of the standard set by FRE 702; and (3) the *McDonagh* court implied that *Daubert* correctly announced the standard for section 490.065.1.

---

4.  *See Green v. State*, 826 So.2d 351 (Fla.Dist. Ct.App.2002); *People v. Taylor*, 335 Ill.App.3d 965, 782 N.E.2d 920 (2002); *In re Commitment of R.S.*, 339 N.J.Super. 507, 773 A.2d 72 (2001); DAVID H. KAYE, DAVID E. BERNSTEIN, JENNIFER L. MNOOKIN, THE NEW WIGMORE, A TREATISE ON EVIDENCE, EXPERT EVIDENCE § 7.8.1– 7.8.2 (Aspen Publishers 2004); R. Karl Hanson, *Special Theme: Sex Offenders: Scientific, Legal, and Policy Perspective: The Science of Sex Offenders: Risk Assessment, Treatment, and Prevention: What Do We Know About Sex Offender Risk Assessment*, 4 PSYCH. PUB. POL. AND L. 50 (1998); William M. Grove and Paul E. Meehl, *Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal (Mechanical, Algorithmic) Prediction Procedures: The Clinical–Statistical Controversy*, 2 PSYCH. PUB. POL. AND L. 293 (1996); Eric S. Janus and Robert A. Prentky, *Forensic Use of Actuarial Risk Assessment with Sex Offenders: Accuracy, Admissibility and Accountability*, 40 AM.CRIM. L.REV. 1443 (2003).

FRE 702 has been interpreted as "impos[ing] a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999) (quoting *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2786). Moreover, it has been held that FRE 702's "requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert,* 509 U.S. at 594, 113 S.Ct. at 2795. "In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity.*" *Daubert,* 509 U.S. at 594, 113 S.Ct. at 2795 n. 9.

■ When faced with the decision of the admissibility of expert scientific testimony, the trial judge acts as a gatekeeper. *Kumho Tire,* 526 U.S. at 147, 119 S.Ct. at 1174 (extending gatekeeping function to technical and other specialized knowledge); *McDonagh,* 123 S.W.3d at 155 n. 12. Just as FRE 702 serves as the key for the gatekeeper in a civil suit in the federal system, we hold that section 490.065.1 serves that function in civil cases in Missouri. "[Their] overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Daubert,* 509 U.S. at 594–95, 113 S.Ct. at 2797. The inquiry, however, into this question must be flexible.[5] *Id.; McDonagh,* 123 S.W.3d at 155.

Here, Dr. Khan testified as to scientific evidence, namely, the actuarial instruments. Although Appellant presented contrary evidence, there was an abundance of evidence showing that the actuarial instruments met the requirements of scientific validity. First, there was testimony and exhibits presented that demonstrated the wide use of the instruments in the relevant scientific community and their general acceptance. *Daubert,* 509 U.S. at 594, 113 S.Ct. at 2797. Second, the State offered as exhibits two textbooks demonstrating the scientific validity of actuarial instruments. *Id.* at 593, 113 S.Ct. at 2796–97. Third, there was testimony that the actuarial instruments were the subject of peer review and publication. *Id.* Finally, there was other evidence tending to show the scientific validity of the instruments via a peer-reviewed research article. *Id.* at 593–94, 113 S.Ct. at 2796–97. Consequently, testimony relating to the actuarial instruments was admissible under section 490.065.1 as there was sufficient evidence for the trial judge to determine that "the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire,* 526 U.S. at 149, 119 S.Ct. at 1175 (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2786).

In so concluding, we have not ignored Appellant's assertion that section 490.065.3 sets forth the applicable standard for admissibility of expert opinion testimony based on scientific knowledge. We believe Appellant is simply wrong when he makes this argument.

By its explicit language, section 490.065.3 applies to "facts or data" that an expert relies upon in rendering an opinion. The purpose of subsection (3) was to bring the legal practice in line with the standard practice exercised by experts in their respective fields. *Wulfing v. Kansas City Southern Indus., Inc.,* 842 S.W.2d 133, 152 (Mo.App.1992).

---

5. For instance, *Daubert* set forth factors, but stated that these were not a "definitive checklist or test." *Id.* at 593, 113 S.Ct. at 2796. Likewise, the 2000 Amendment to FRE 702 set forth broad categories to encompass any relevant factors. *See* Advisory Committee Notes (2000).

For instance, in life and death situations, doctors routinely rely on numerous sources, including statements from third parties, in rendering an opinion or diagnosis. *See Glidewell v. S.C. Management, Inc.,* 923 S.W.2d 940, 951 (Mo.App.1996). Prior to the adoption of section 490.065.3, a doctor could not come into court and testify as to these facts; he or she could only state the ultimate opinion or diagnosis. *Stallings v. Washington University,* 794 S.W.2d 264, 270 (Mo.App.1990). Prior to the enactment of section 490.065, "[w]hen the reasons for the expert's opinion '[were] based in part on hearsay, as far as the witness [was] concerned, the accepted and proper way to present in evidence [the] opinion of [the] expert witness [was] to present competent evidence of those facts from some proper source, and then submit them to the expert witness in a hypothetical question along with other relevant matter.'" *Id.* (quoting *Davies v. Carter Carburetor, Inc.,* 429 S.W.2d 738, 751 (Mo.1968)).

As such, if a doctor based his or her diagnosis on statements from nurses, family members, or other doctors, then those individuals would be required to come to court to testify before the doctor could testify as to the reasons for the diagnosis. *Glidewell,* 923 S.W.2d at 951. The legislature recognized that it was inconsistent to allow experts to rely on hearsay while practicing their profession, but not let them rely on hearsay when rendering their opinion in court, unless substantial time and money were expended to bring those facts forth and put in evidence. It remedied this inconsistency by enacting section 490.065.3.

Under this subsection, "[t]he questions are ... whether the hearsay [or lack of firsthand knowledge] as tested by profes-

sional acceptance standards in the field is reasonably reliable, and whether it is otherwise reasonably reliable as a matter of general evidentiary principle." *Wulfing,* 842 S.W.2d at 152[18]. The first mandate under subsection (3) requires a court to determine whether the facts and data are reasonably relied upon by experts in the particular field.

■ The practice of allowing an expert to testify as to facts and data of a type reasonably relied upon by experts in the field "as a juridical principle, is justified by the premise that a witness with specialized knowledge is as competent to evaluate the reliability of the statements presented by other investigators or technicians" as a fact-finder is to pass upon the credibility of an ordinary witness on the stand. *Id.* at 152. Generally, the trial judge is expected to defer to the expert's assessment of what data is reasonably reliable. *Keyser v. Keyser,* 81 S.W.3d 164, 169 (Mo.App.2002); *Glidewell,* 923 S.W.2d at 951[9]. For instance, "[m]edical records are the quintessential example of the type of facts or data reasonably relied upon by experts in the field of medicine." *Id.* at 951.

■ The second mandate under section 490.065.3 requires the trial judge to look beyond the expert's testimony that his or her reliance on certain facts and data are reasonable due to the general standard of the expert's field. The trial judge must then ensure that the facts and data are otherwise reasonably reliable. "It is only in those cases where the source upon which the expert relies for opinion is so slight as to be fundamentally unsupported, that the finder of fact may not receive the opinion." [6] *Keyser,* 81 S.W.3d at 169.

---

6. As an example of this latter requirement, the reader may consult *Edgell v. Leighty,* 825 S.W.2d 325 (Mo.App.1992). There, a police officer, called as an expert to reconstruct the accident, was not allowed to "express an opinion that plaintiff made an improper turn

This is not to say that section 490.065.3 does not apply to this case. Both subsection (1) and subsection (3) apply in all civil cases wherein an expert testifies. However, when a litigant wishes to challenge the underlying scientific principles of an expert's opinion, i.e., his or her "scientific knowledge," section 490.065.1 is the applicable standard. *Daubert*, 509 U.S. at 589–93, 113 S.Ct. at 2795–97. When a litigant wishes to challenge what an expert relies upon in rendering an opinion, i.e., certain "facts or data," an objection based on section 490.065.3 is appropriate. In some cases, the line distinguishing the two can be difficult to ascertain and may involve similar questions. *See*, KAYE, THE NEW WIGMORE, EXPERT EVIDENCE § 3.1, at 76 n. 8.

In this case, if Appellant wanted to challenge the *validity* of the actuarial instruments themselves (and opinions based thereon), he should have objected on the basis of section 490.065.1 and presented that point and argument on appeal.[7] An at-trial objection to this evidence based on subsection (3) and an appellate argument on that subsection could only be used to challenge the facts and data used by Dr. Khan in calculating Appellant's risk of re-offending. Thus, Dr. Kahn's use of prior conviction information would be subject to *objection for not meeting the section 490.065.3 standard if the source of his* information was not of a type reasonably relied upon by experts in the field and was not otherwise reasonably reliable. As an example, if Dr. Khan had testified that he gained this knowledge from a third party on the street, this might not be viewed as reasonably reliable information. Dr.

Khan, however, stated that he gained this information from official arrest records, from Appellant, and from reports of probation and parole. These are the types of facts and data reasonably relied upon by experts in the fields of psychology and psychiatry. Moreover, these facts and data are otherwise reasonably reliable.

We find no abuse of discretion when the probate court allowed Dr. Khan to testify regarding the use of actuarial instruments. This testimony was admissible under section 490.065. Point denied.

### Points II and III: Jury Instruction and Motion to Dismiss

In Point II, Appellant alleges the court committed reversible error by using a jury instruction that read: "If you find [Appellant] to be a sexually violent predator, [Appellant] shall be committed to the director of [DMH] for control, care, and treatment." He claims that this was error because to inform "the jurors that the purpose of the law is 'treatment' minimizes the sense of responsibility for the jurors in determining the ultimate question of whether [Appellant] is a sexually violent predator."

In Point III, Appellant argues that the court committed reversible error in denying his motion to dismiss the commitment petition. He alleges that he pled guilty in 1992 "in exchange for a specific term of confinement substantially below the maximum permitted by law." Appellant then argues that "[h]e may not have done so if he had known that a subsequently enacted law would civilly confine him based upon that plea." He states the court should have dismissed the commitment petition

---

when that opinion was based upon the hearsay statements of witnesses." *Id.* at 328–29[2].

7. Liberally read, Appellant's objection at trial encompassed subsection (1). On appeal,

however, he has never presented a point relied on and argument pursuing trial court error predicated upon an alleged violation of section 490.065.1.

"as a means of enforcing the plea agreement entered into between himself and the State."

These identical contentions were raised in *In the Matter of the Care and Treatment of Scates v. State,* 134 S.W.3d 738 (Mo.App.2004). This court analyzed and discussed the two arguments, and ultimately, we rejected the same. Based on the discussion and the law encompassed in the *Scates* opinion, Appellant's Points II and III are denied without further comment.

The judgment of the trial court is affirmed.

RAHMEYER, J., and BATES, C.J., concur.